6-1455 Palmetto Pharmaceuticals versus AstraZeneca. Mr. Isaacson, please proceed. May it please the court, we are here today because the district court incorrectly attached two state-of-mind requirements to our claims, either a recognized need or an intention or purpose. These are phrases that do not appear anywhere in our patent or our prosecution history. In contrast, before the district court, we made two different proposals. Your problem is Janssen. And it's like I looked back at the dates, Janssen was signed in 2003, your patent issued in 2002. You didn't see it coming, and like a freight train, it has the same subject in need of language. I understand. That's why it doesn't appear in your spec, that's why it doesn't appear in your prosecution history. And you know what? I may not even agree with the way Janssen was decided, but I am definitely and clearly bound by it. So that's your problem. So why don't you just start your argument and end your argument with why Janssen doesn't hold you to the same outcome that was reached in Janssen. Okay. First, no intent for direct infringement is the norm, and intent is an exception. And as you noted, Janssen came out after we issued. And we have to look at the facts and circumstances of Janssen in our case. So first, going straight to Janssen, it was a different issue was before this court in Janssen. And if you look at the beginning of page 1333, where the court defined the issue, the issue there was the party's, quote, dispute how the treating or preventing phrase and to a human in need thereof phrase should be read. The issue reduces to whether such a human, that human being, the person being treated, must know that he is in need of either treatment or prevention of that condition. And in Janssen, that person was the vitamin person consumer. The person on the street goes in and buys some vitamin B, vitamin B supplement. They have no medical education to know whether they have macrocytic megaloblastic anemia. It was a way for the district court and the district court affirmed to find that the consumers and Rexall Drug Source did not have liability. Throughout that Janssen argument, starting at 21 and running on for maybe 10 pages, in various iterations, you make the argument that the district court erred when it construed the disputed limitations to, quote, require an intent in various ways. Here's my problem with that. In the hearing before the special master, JA 21016, you argued that the person practicing claim one, quote, must intend to treat a subject who is at risk for cardiovascular disease and adverse events. At 20775 in the joint proposed claim construction chart, you acknowledged that the disputed limitations, quote, require an intent, close quote. When you objected to the special master's constructions at 21278, you didn't dispute that claim one required some intent, but instead, quote, agreed with AstraZeneca's counsel, the issue here is intent to do what, close quote. How can you fairly state that you haven't waived the no intent argument? Sure. We had initially, we had proposed two constructions. The first was no intent. The second was, if there is to be intent, it shouldn't be a dual intent requirement. It should be a single intent requirement concerning provision of a benefit to the patient. And the term benefit is very important to our second construction. And it's a term that AstraZeneca barely mentions. But if I could get to what was discussed with the district court when we opened up with our brief at 21046, right there, we started with, and I'll quote, Palmetto disagrees with one highly significant aspect of the special master's report recommendation, the legal interpretation of the decision in Janssen and its application to the claims in Palmetto's US patent. Under the special master's construction, finding a patent infringement hinges upon proof of the doctor's state of mind, even though patent infringement traditionally requires no such proof. Later, in our slides for the oral hearing at Joint Appendix 21168, we provided a slide discussing the Connell case. Connell came out after we had done our briefing, but nevertheless, that shows that we said generally there's no center inquiry and that direct infringement is a certain liability offense. And finally, going back a little bit, and I think that this court's decision in CCS Fitness v. Brunswick Corp. is helpful here. This court looked at whether the trial court and the party court claiming waiver had previous notice of a proposed construction. And the court in fitness, in CCS Fitness, found that an allegedly waived construction was raised during a previous summary judgment motion, a factor militating against a waiver. Same thing happened here. In our joint appendix at 4131 and then at 18600, Janssen v. Rexall was briefed during Ashton Seneca's motion for summary judgment non-infringement. Although we agreed at that point that they didn't have to go into a construction, the order denying summary judgment. You can find that at joint appendix 18613, footnote 7. That's the magistrate's recommendation, which was affirmed by the district court at joint appendix A19162. So the court in Ashton Seneca knew our position from the very beginning. A lot of these other statements we've discussed come in terms of the second proposed construction of a single attempt connected to the word benefit. But just because we provided that second proposal didn't mean we waived our first and that this case should be looked at as like any other method of treating claim. There's no intent for the direct infringer. And when we did discuss Janssen, and Ashton Seneca provided a few quotes at page 17 of their opening brief, we did say, yes, Janssen applies an intent to the Janssen claims. And if you had the facts exactly like Janssen, that might be appropriate. But our facts are very different. We've never agreed that Janssen should be applied. So if I want to get to, I'd like to get to why we think Janssen should be applied. I discussed that there was a different issue at the time. And again, getting back to Janssen discussed whether the human must know that they need a treatment. What do you think is the principle we should take away from Janssen? I mean, I know you want to identify certain facts that are different from the facts here. But there seems to be a certain legal principle at stake in Janssen. And I'm just trying to figure out what do you think is the right articulation and boundaries of that legal principle coming out of Janssen, a precedential opinion. I think Janssen was concerned that what I'm presuming is the person of skill of that claim, which I think is the vital purchasing consumer, had a very low level of skill and knowledge. It had no medical knowledge. I mean, Janssen doesn't come out and say, the person of ordinary skill is this. But I do take from that one statement of the issue at the beginning of 1333 that the person of ordinary skill in Janssen seems to be the person who's actually taking the vitamins. And ours is, our person of ordinary skill is a far different person. It's a medical doctor, board certification, cardiology or something similar, and five years of clinical experience treating patients with cardiovascular diseases and abnormal lipid levels. So our person of ordinary skill is the treating doctor. Yes, they should have knowledge about nitric oxide. That's in our patent. It's in the medical literature. It means that they don't have to be thinking about nitric oxide when they see a person who's older and perhaps has hypertension, risk factors, cardiovascular disease, and they prescribe a statin like Crestor. They don't need thinking about the biochemistry, because our person of ordinary skill is not a biochemist. It's a treating physician. And so if there is a tension between Janssen and Phillips, and Phillips says we start claim interpretation from the point of view of, the person of ordinary skill in the art is the objective baseline where claim interpretation begins, we have to start with that. Instead, what the district court did is took the vitamin patent as a template, laid it over our claims, and tried to look for things that were consistent with that. But that interpretation started with Janssen, where we think our claim interpretation needs to start with our person of ordinary skill. And if there is to be an intent, we need to look at the word benefit. Benefit is in our claim. It means reduction of clinical events, or the risk of clinical events. That's what the treating doctor wants to do when they're giving this ad. Well, your problem with that argument is that it doesn't comport with the disputed, limitations terms. Where does a term of the disputed limitation refer to selection or administration of treatment, based on cardiovascular risk factors? What are you referring to? What am I referring to? Are you looking in the claim? He asked you where your claim has what you just said it has. Benefit was defined, was construed as reduction of clinical events. The disputed limitations recite, A, a method for treating a cardiovascular risk factor. I'm sorry, they don't. They say, a method for treating a subject who would benefit from increased nitric oxide production in a tissue comprising administering to the subject in need of such treatment. Claim one teaches that the treatment should be administered in an amount effective to increase nitric oxide production in said tissue of the subject. Yes. You don't mention cardiovascular in there. Clinical events are the cardiovascular events. All right. OK, would you like to save the rest of your time for rebuttal, or do you have something more you want to add in your initial argument? I just wanted, I'll be quick. All we wanted to do is to start with a standard Phillips construction. And we think the district court, by starting with Janssen, interfered with that. We wanted our patent to be construed on the four corners of our patent and our prosecution history. Janssen was very different, and that the person, ordinary skill in the art was different. The technology was different. And as this court said in the Monsanto v. Bayer bioscience case, we don't use one patent to construe another. And in that case, the technology was the same, but the specifications were different. So we submit that the district court erred from the start by starting with Janssen. And that essentially interfered with the correct construction. And after that, I will save the rest of my time for rebuttal. OK, Mr. Sykes. Thank you, Your Honor. Christopher Sykes here on behalf of Defendant AstraZeneca. Let me start just with the basic point about Janssen. Janssen, of course, followed Rappaport, which had construed the same kind of method of treating language. And that's from 2001. This is a patent which is about a method of treating a patient in need. That's a very common language. It's a very well understood language. And what Janssen recognized is that there is a well understood meaning to treat a patient in need. And that is to intend to address the recognized need. Treating is an intentional act. That is what Janssen recognized. So even beginning with Phillips and Phillips' emphasis, that what we look at is the meaning of the words and claims as used in the intrinsic evidence. The law is the law. But why does our case law allow for a knowledge component in a patent claim or some state of mind? It sounds a little peculiar. Typically, a method step requires a certain series of actions. And the product claims are tangible, concrete things. And now here, we have a method claim about taking some actions, but taking some actions also while you're thinking something inside your head. It's not that uncommon to see method claims that are purposeful, that require them to achieve a purpose. And that's important, particularly in this context. You can achieve a purpose without knowing. Let me give you an example. My son, he had a rash on his face recently. This is not a made-up story. He had a rash on his face recently. I took him to the doctor for the rash because it was red and it bothered him. A little irritated. It also itched. Now, he never mentioned that to me or the doctor. Well, the doctor gave him a steroid, cleared the rash up. You know what else the steroid had contained within it? Some sort of anti-cortisone type thing that also removed the itch. And Billy says, this medicine is great. It doesn't itch anymore. So he was a subject in need of an anti-itch cream. He hadn't communicated that to me, he's a child, or his doctor. The doctor gave him a steroid, which cleared up the rash. It also happened to take care of his need for something to clear up the itching. So the doctor performed a method that would fall on all fours if this were a claim for a subject in need of an anti-itch cream. Billy had the itch, he was such a subject, and it effectively reduced the itch.  And why does it have to be that he knew and the doctor knew when prescribing the treatment that this cream was going to treat the itch? I would say that shows exactly why it's important to construe method of treating claims that way. Because, of course, part of the idea of patent law is promoting research on new uses for medicines that are already in use. But patent law is strict liability. You're dead in the water whether you know you're infringing or not. Which would also mean that if you believe you have a new use, say for statin, but it's been used before. For that. Even if not knowingly used that way before. If it had been administered to a person who was non-hyperlipidemic under their construction, it's anticipated. The way you claim new treatments is that a doctor who maybe has been administering it to patients unbeknownst to him or her in a way that would affect that treatment, never recognized it. Now somebody comes along and says, you know what? Well, that couldn't render it invalid. And the reason it couldn't render it invalid is you have to have prior known or public use. It has to be publicly accessible and known. I'm trying to think of how that could be prior art that would invalidate a patent. Inherent anticipation, Your Honor. If, for example, this claim was simply directed to giving a statin to a person and look, it has this effect. Well, it has that effect whether you intend it or not. So if the statin was administered to a non-hyperlipidemic patient in the past, and now we know it can be used to treat some condition before. Well, if the person had the condition before the patent was filed, that would be inherent anticipation. It's because the claim itself requires the doctor to intend the effect that allows you to patent new uses. That's why this language is quite common in method of treating patents. Because what it says is, it's not that people haven't received the drug before, but now the drug is being used for a new purpose. And I think Janssen and Rappaport recognize that that's a very important aspect of method of treatment claims. It says not simply, now a new drug has been developed. Well, fine, get a drug substance patent. But how do you claim new treatments? And that's this case. There's no claim here that Palmetto invented stats. The claim here is that they came up with a new way of using it. A new way of using it. And specifically, to use it for the specific purpose of raising NO rather than lowering cholesterol. That's a purposeful act. You're fighting a very good fight, by the way. But you're fighting a harder fight than you need to. Because isn't all of my logic shut down by Janssen? That's the real thing. That's why when I started with him, I said, whether I agree with Janssen or not, I've got to obey it. It absolutely is shut down by Janssen. And Janssen is good law. And it's important law in this area. All law is good law. Fair enough, Your Honor. And in this case, it really comes in. And of course, once we get to the intent, I would point out that both the special master and the district judge here found that they had not preserved an argument that there's no intent. And they clearly didn't. Their objections to the report and recommendation of the special master said specifically, and Your Honor, you pointed this out at 821-048, that the correct, properly constituted requires intent. They admit in their brief that Rappaport and Janssen require intent. So we're dealing here with what intent? And Phillips says, look at the language of the claim and the specification, the intrinsic evidence. The language of the claim here is not reduction in cardiovascular risk. They're very specific words. And it's a subject who would benefit from increased nitric oxide production in a tissue comprising administering to the non-hyperlipidemic subject in need of such treatment a statin in an amount effective to increase nitric oxide production. The claim beats you over the head with the fact that the purpose here is specifically to raise nitric oxide. Isn't there some very tight, close correlation between increasing nitric oxide production and helping people with cardiovascular disease or hypertension? I would say there's dispute between the parties. Maybe almost a one-to-one correlation? I don't believe so, Your Honor. There's some dispute over that between the parties. But that's an infringement issue. And of course, what they're actually accusing infringement is something entirely different from that, which is giving a statin to patients who are identified at risk because of yet another biochemical marker. I thought the patent spec, when it talks about, you know, in the context of the patent spec, when it talks about increasing NO production, it's in the context of treating people with cardiovascular disease and hypertension problems, right? The patent spec is actually very broad in that regard. It says, the only example, of course, is in vitro. There's no treatment of anybody in the patent. There's one example of the patent, and it's an in vitro study measuring simply an increase in NO production. Am I misremembering? They didn't say anything about cardiovascular or hypertension? They did. And here's the language, which is why they were not limiting themselves. They said, stimulation of NOS in the presence. This is from column four, beginning of line 60. Stimulation of NOS in the presence of excess L-arginine or other substrate precursor of native NO may be used to prevent, treat, arrest, or ameliorate any disease or condition which is positively affected by NO production. Such conditions include hypertensive cardiocerebro-renovovascular disease and their symptoms, as well as non-hypertensive cardiocerebro-renovascular diseases. So they're saying, look, anything, and they repeat this elsewhere, anything that would be improved by increased NO, that can be done by following our method of increasing NO. They were not focused on any particular disease, including specifically not focused on cardiovascular risk or even that specific kind that's identified. They were saying, and we can argue over whether it's a valid mention, but they were saying, I've discovered that giving statins, at least with another substrate like arginine, I will increase NO production in patients. And I think that's a good thing. And there's going to be all sorts of benefits from that. That's what they're describing in the patent. The title of the patent, it's not reduction in cardiovascular risk. It's method of stimulating nitric oxide synthesis. Throughout the specification, what they're saying is, I've discovered a way of using a statin for the purpose of increasing NO production in tissue. Do that, and there'll be medical benefits. And that's what they claim. But it requires a doctor to intend to do that. And they distinguish at the very beginning of the patent, in column one, the old use of reducing cholesterol to the new use of increasing NO production. And that's what they claimed. And the special master in the discord properly recognized that. Now that takes me to our cross appeal, which is a conditional cross appeal, which is only if the construction is reversed. The point is, it's that construction that goes to the original claim. This is a patent that went through re-exam after our use was approved. And they removed a limitation from the claim. Original claim one required that the statin be administered to such a patient, but also that it be administered irrespective of the subject's cholesterol level. That limitation was taken out in re-exam. As a general matter, taking limitations out of the claim in re-exam broadens the claim and is invalid. You're forbidden from broadening claims in re-exam. And that's an important protection for the public. You can't go back after you see a product approved and say, now I'm going to broaden my claims to capture. And that's what they did here. The district court found there was no broadening by reading the term irrespective of a subject's cholesterol level to have no meaning. The court construed it to mean either hyperlipidemic or non-hyperlipidemic. And that means everyone. It literally renders that original claim limitation superfluous, meaningless. We think that's wrong. Claim limitations are not meaningless. It's also wrong in terms of the meaning of the words. It's irrespective, administering irrespective of the subject's cholesterol level is not telling you about the subject. It's telling you about the administration of the drug. It's an additional intent or exclusion of intent. The first was to require the doctor to intend to raise NO. The original limitation also required the doctor not to intend to lower cholesterol or alter cholesterol. To administer the drug for purposes of raising NO, not for purposes of altering cholesterol level. That was a limitation that would have prevented them from asserting in Frishman's case as well, because what they're accusing also shows a reduction in cholesterol. And that was pulled out. We think the district court made an error there by relying on the prosecution history from the re-exam to construe the claim to be superfluous. But it's wrong to rely on re-examination prosecution history to determine whether or not a claim is broadened in re-exam. And this court said that recently. What does the word irrespective mean to you? Irrespective means without regard to, without consideration of. That's the plain meaning of irrespective. So when the claim read as administering irrespective of the subject's cholesterol means don't consider the subject's cholesterol level when you choose to administer the statin. In fact, that limitation existed side by side in original claim 2 with the requirement that the subject be non-hyperlipidemic. Clearly, they're separate limitations directed to different things. The original claim 2 required the subject to be non-hyperlipidemic, but nonetheless it requested the administration to be without regard to the subject's cholesterol level. What does that tell you? That the doctor is not considering cholesterol level when deciding to administer the statin. It would not cover a case where the doctor decides, you know what? I'm going to administer the statin to you both for purposes, I think you could use a boost in NO, and I'd like to bring your cholesterol down even further. That was outside the original claim. During re-exam, they took that limitation out so that it was entirely just about increasing NO. We think they did so specifically, and not just because they submitted our labeling during re-exam for purposes of capturing that, but it doesn't matter why they did it. You're forbidden in re-exam from broadening a claim, and that's what they did. But that's our conditional cross-appeal. If the court affirms on the meaning of the preamble term on a method of treating a patient who would benefit from increased NO production, it's unnecessary to read that issue. And we think the plain meaning of that, and the holding of Janssen, makes it clear that the district court correctly did that. But if it does reverse, we do have our conditional cross-appeal. Thank you, Mr. Theibs. We have some rebuttal time. Mr. Isakson? First, turning to the opposition points that Mr. Sypes raised, Janssen doesn't shut down our second alternative proposal at all. In fact, if anything, that proposal        I think that's a good point. I think that's a good point. In Rappaport, the claim was to a method of treating sleep apnea, a diseased state. And our proposal would be the doctrine tends to provide the benefit that's treating clinical events and preventing and reducing the risk of clinical events. What our invention was, ultimately, to boil it down, was we were treating a new population of people who never were treated before. They were at risk for cardiovascular events. That risk could be ascertained by things like hypertension, age, family history of heart disease, etc. These patients were not being treated because they were not hyperlipidemics. They did not have high cholesterol and everybody thought statins were only for reducing cholesterol. Dr. Casemeyer discovered it and filed his application in 1997. In the briefing, AstraZeneca contended that Dr. Richter was first. But he wasn't because his early provisional applications didn't describe the use of statins. His earliest priority date was 1999. Do you have any patent claims that are directed to treating a person with cardiovascular disease? As opposed to treating a person in need of increased NO production? Our dependent claims 15-17 We only have one independent claim. Our dependent claims 15-17 discuss the treatment of various types of disease states such as stroke, reperfusion events which are ischemic events when there's a cessation of blood flow. That was Dr. Casemeyer who mentioned he was the first to do it. I've heard of Mr. Sipes talking a little bit about inherent anticipation. We've only been in the infringement phase of this litigation. We haven't even had discovery on validity so I don't know why we're discussing anticipation at all at this point. We'll have a chance to do that if we're back before the district court. In terms of the correlation between nitric oxide and the need for nitric oxide and one of the risk factors, elevated C-reactive proteins, you can find evidence of that on page 4 of our reply brief. One is AstraZeneca's promotional literature. The other is a paper by Dr. Richter. If there aren't any questions on that, I'll turn to their cross appeal. If you turn to the cross appeal, then he gets back up if you feel like you need to talk about it. You're out of time entirely. We'll stand on our briefs. Very good. So you don't get any cross appeal time. That ends this case. It's taken under submission.